MARGARET CRAMER GREEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6183–78.   Filed September 15, 1980.

Margaret Cramer Green, pro se.
*Linda J. Wise,* for the respondent.

BRUCE, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the year 1976 of $577 as set forth in his statutory notice of deficiency dated April 17, 1978. The issues presented[1] for our decision all involve whether petitioner

---

[1]The contested adjustment to petitioner's taxable income necessarily resulted in adjustments to petitioners self-employment tax and claimed sales tax deduction for 1976, as well as the

is entitled to business-expense deductions relative to her activity as a blood plasma donor in excess of those allowed by respondent. Petitioner claimed as business-expense deductions amounts allegedly spent for medical insurance premiums, special drugs, high protein diet foods, and transportation to and from the laboratory where petitioner donated her plasma. Petitioner also claimed as a business deduction a depletion allowance for certain minerals and antibodies in her blood.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Margaret Cramer Green resided in Milton, Fla., when the petition herein was filed and when she filed her Federal income tax return for 1976 with the Internal Revenue Service Center, Chamblee, Ga. In 1976, petitioner had income in the form of wages from Wiggins, Inc., and The Shirt Shop, both in Pensacola, Fla., in the amounts of $4,080.59 and $368.50, respectively. However, petitioner's primary source of income[2] was from her activity as a blood plasma donor to Serologicals, Inc., of Pensacola (hereinafter the lab), an activity she has been engaged in for approximately 7 years.

By a process known as plasmapheresis, a pint of whole blood is removed from the arm of a blood plasma donor, such as petitioner. From this whole blood, the plasma is centrifugally removed and the remaining red cells are returned to the donor's body. The process is repeated. Generally, two bleeds produce one pint of plasma. Petitioner is paid for her donations by the pint.

Petitioner, who has that rare blood type known as AB negative, reported gross receipts of $7,170 from her donor activity in 1976. This amount consisted of $6,695 in donor "commissions" and $475 in travel allowances, paid at a rate of $5

treatment of medical insurance premiums as a medical-expense deduction, rather than a business-expense deduction, by the respondent in the notice of deficiency. Thus, our resolution of the contested adjustment will affect those other related adjustments directly.

[2]Petitioner does not contend that the money she received was not income subject to Federal income taxation, nor does she contend that the income was capital gain on the sale of her plasma as a capital asset. Without making a formal decision at this time, for the purpose of stating the facts in this case we will refer to the funds received by petitioner for her plasma as ordinary income.

per trip. Offsetting these gross receipts, petitioner claimed related business-expense deductions totaling $2,355 of which only the amount of $132 was allowed by respondent in his notice of deficiency as shown below:

| Expenses | Claimed | Allowed |
|---|---|---|
| Legal and professional fees | $20 | $20 |
| Medical insurance | 150 | 0 |
| Special drugs | 260 | 112 |
| High protein diet foods | 780 | 0 |
| Travel | 475 | 0 |
| Depletion | 670 | 0 |
| | 2,355 | 132 |

During 1976, petitioner paid $93.09 in premiums on hospitalization insurance policies. In support of the $260 deduction claimed for special drugs, petitioner submitted receipts, canceled checks, and cash register tapes from two drug stores and a health food store, all totaling $285.90. Items totaling $13.79 are clearly dated 1977. Some of the receipts and the cash register tapes duplicate purchases evinced by canceled checks submitted by the petitioner. Items not duplicated or dated in 1977 total $206.60. Petitioner submitted no evidence to support her deduction for travel expenses for $475, the amount she received as travel reimbursement. However, it is clear that, at $5 per trip, petitioner made 95 trips between her home and the lab where she made her plasma donations, a distance of 20 miles, 40 miles round trip. Although sometimes petitioner performed a few personal tasks during her return trips from the lab, petitioner always traveled directly to the lab prior to her donation.

Petitioner's household during 1976 consisted of herself and three children aged approximately 14, 15, and 16 years. As proof of the total grocery bill for this household, petitioner has canceled checks totaling $2,705, an approximate monthly average of $225.41. Of this amount, petitioner's claimed deduction for high protein diet foods was $780, or $65 per month.

To insure that the substance necessary for the production of typing serums is being obtained, the blood of each plasma donor is tested for the desired concentration of iron, protein, and antibodies. If a donor's blood has a low concentration of these items, the donor is not allowed to give plasma. Although the red cells of each bleeding are returned to the donor, the usable iron

of those cells is lost in that bleeding and protein is taken from the blood in the form of the plasma itself. These items, as well as vitamins and minerals, must be replaced by diet. If a donor's blood has a low antibody concentration, the donor may receive a "stim shot" whereby this concentration is artifically increased by an injection of incompatible blood type. This process is accompanied by pain and discomfort and carries the risk of hepatitis and blood clotting. Eventually, a donor's blood plasma will lose its ability to regenerate and will not respond to a "stim shot." For this loss of blood content and ability to regenerate, petitioner claimed a 10-percent depletion deduction for 1976.

Respondent has disallowed those claimed business-expense deductions as shown above as (1) not constituting ordinary and necessary expenses for the performance of a trade or business under section 162,[3] or (2) not substantiated as paid, and if paid, as paid for the deductible purpose designated.

## OPINION

Generally stated, the question presented by this case is whether petitioner may offset her taxable income by the expenses she incurred in obtaining payment for her blood plasma "donations." The ability to offset income with expenses incurred either under section 162, in carrying on a trade or business, or under section 212, for the production of income, requires by definition the existence of related income. Both parties to this case base their respective arguments upon the implied assumptions that petitioner realized income upon receiving payment for her plasma and that this income should be characterized as ordinary. Although these assumptions may seem obvious, since this case presents some novel legal questions, we feel compelled to lay a firmer foundation for our conclusions herein.

Clearly, petitioner realized income. Section 61 states that "gross income means all income from whatever source derived.[4] Such sweeping language must be broadly interpreted to fulfill

---

[3]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

[4]SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

the intent of Congress to implement a comprehensive income tax. *Commissioner v. Jacobson,* 336 U.S. 28, 49 (1949); *Commissioner v. Smith,* 324 U.S. 177, 181 (1945). Congress intended "to use the full measure of its taxing power." *Helvering v. Clifford,* 309 U.S. 331, 334 (1940). Fulfilling this intent, the well-settled test for income is that enunciated in *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431 (1955), which looks for "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." The Fifth Circuit, to which appeal in this case would go, has followed this test as a search for lasting economic gain realized primarily by the taxpayer personally, *United States v. Gotcher,* 401 F.2d 118, 121 (5th Cir. 1968); *United States v. Rochelle,* 384 F.2d 748, 751 (5th Cir. 1967), cert. denied 390 U.S. 946 (1968). See also the Fifth Circuit's general discussions of this and other matters as they specifically relate to blood plasma sales in *United States v. Garber,* 607 F.2d 92 (5th Cir. 1979), revg. and remanding, on rehearing en banc, 589 F.2d 843 (1979), a criminal fraud case. All of these gains are taxable, unless specifically excluded. *Commissioner v. Kowalski,* 434 U.S. 77, 82–83 (1977). Petitioner received the payments for her plasma directly, without any conditions subsequent which might require repayment of the funds or might control her use of the funds. The payments were not subject to any exclusion from income.[5] The payments were gross income to petitioner under section 61.

Next, we must determine the character of the income realized by petitioner for her plasma. This income was not capital gain. Capital gain involves the sale or exchange of a capital asset. Section 1222(1) and (3). If petitioner's activity is viewed as the sale of property held for sale to customers in the ordinary course of business, petitioner's blood plasma, the property held for sale,

---

(1) Compensation for services including fees, commissions, and similar items;

(2) Gross income derived from business;

(3) Gains derived from dealings in property;

[5]Of the various sections which specifically exclude items from gross income (see secs. 101–124), none apply to the instant case. Even though petitioner may have suffered pain and discomfort from the extraction process, sec. 104(a)(2) excluding "damages received (whether by suit or agreement) on account of personal injuries or sickness" does not apply. Sec. 104 applies to those payments resulting from tort claims. See, e.g., *Knuckles v. Commissioner,* 349 F.2d 610 (10th Cir. 1965); *Agar v. Commissioner,* 290 F.2d 283 (2d Cir. 1961). Here, no tort or tort-related claim is involved. Petitioner consented to the process which caused her discomfort. Cf. *Starrels v. Commissioner,* 35 T.C. 646, 648 (1961), affd. 304 F.2d 574 (9th Cir. 1962).

is not a capital asset. Sec. 1221(1). On the other hand, if her activity is viewed as a service, her blood plasma is an integral part of that service and is not part of a sale or exchange. Cf. *Hahn v. Commissioner*, 30 T.C. 195, 198 (1958), affd. 271 F.2d 739 (5th Cir. 1959). Therefore, regardless of how the activity is viewed, it is not the sale or exchange of a capital asset and the income realized therefrom is not capital gain.

Nevertheless, the identification of the activity as either the sale of a product or the performance of a service *is* important in determining gross income and the deductibility of certain items in the calculation of adjusted gross income and taxable income, which is the general issue before us. Under the facts of this case, we find that petitioner's activity was the sale of a tangible product. From petitioner, who did little more than release the valuable fluid from her body, the plasma was withdrawn in a complex process by the equipment of the lab. Petitioner performed no substantial service. She was paid for the item extracted by the lab. Except for the unusual nature of the product involved, the contact between petitioner and the lab was the usual sale of a product by a manufacturer to a distributor or of raw materials by a producer to a processor. A tangible product changed hands at a price, paid by the pint.

The rarity of petitioner's blood made the processing and packaging of her blood plasma a profitable undertaking, just as it is profitable for other entrepreneurs to purchase hen's eggs, bee's honey, cow's milk, or sheep's wool for processing and distribution. Although we recognize the traditional sanctity of the human body, we can find no reason to legally distinguish the sale of these raw products of nature from the sale of petitioner's blood plasma. Even human hair, if of sufficient length and quality, may be sold for the production of hairpieces. The main thrust of the relationship between petitioner and the lab was the sale of a tangible raw material to be processed and eventually resold by the lab.

Finally, before we turn to the claimed deductions, themselves, we must determine whether petitioner's donor activity was a "trade or business" within the meaning of section 162. Unfortunately, the only definition of "trade or business" or of what constitutes "carrying on any trade or business" provided by section 162 is that which has evolved under the prevailing case law interpreting that section. An explicit definition of the

phrase is not contained in this case law or in the Internal Revenue Code. *Barrett v. Commissioner,* 58 T.C. 284, 288 (1972). Although various factors have been considered in determining whether a taxpayer's activities are a trade or business, each of these factors is only a guideline and no one factor is conclusive. *Barnett v. Commissioner,* 69 T.C. 609, 613 (1978); *Gentile v. Commissioner,* 65 T.C. 1, 4 (1975); *Barrett v. Commissioner, supra* at 288. "To determine whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case." *Higgins v. Commissioner,* 312 U.S. 212, 217 (1941).

Petitioner has been selling her blood plasma on a regular basis continually for over 7 years. This activity has required petitioner's daily attention to her special diet and her weekly or bi-weekly visits to the extracting laboratory. Her efforts in maintaining her special diet and making the trips to the extracting laboratory were motivated by the prospect of receiving payment for each pint of acceptable plasma extracted. Thus, petitioner was actively engaged[6] in the continual and regular[7] process of producing and selling blood plasma to the lab for profit.[8] Further, petitioner held herself out as engaged in the sale[9] of blood plasma to the lab upon its acceptance.

Upon the facts, we find that petitioner was in the trade or business of selling blood plasma. Therefore, to be allowable, the deductions claimed by petitioner must be substantiated as "ordinary and necessary expenses paid or incurred during the taxable year in carrying on" her activity as a seller of blood plasma. Sec. 162.

First, petitioner claimed a business deduction for the full amount of health insurance premiums paid in 1975. Respondent treated the amount substantiated, $93.09, as a medical expense deduction, allowing half, the other half being offset by 3 percent of petitioner's adjusted gross income. Sec. 213(a)(1). We agree with respondent. Although petitioner attempts to justify the

---

[6]Cf. *McDowell v. Ribicoff,* 292 F.2d 174 (3d Cir. 1961).

[7]*Gentile v. Commissioner,* 65 T.C. 1, 4 (1975).

[8]See, e.g., *International Trading Co. v. Commissioner,* 275 F.2d 578 (7th Cir. 1960); *Doggett v. Burnet,* 65 F.2d 191, 194 (D.C. Cir. 1933).

[9]Cf. *Deputy v. duPont,* 308 U.S. 488, 499 (1940) (Justice Frankfurter concurring); accord, *Snow v. Commissioner,* 416 U.S. 500, 502–503 (1974); see also *McDowell v. Ribicoff, supra; White's Will v. Commissioner,* 119 F.2d 619 (3d Cir. 1940).

deduction by comparing her body to some insured manufacturing machinery, the instant set of facts prevents such a comparison; her body is not a replaceable, or easily repairable, machine maintained solely for the production of blood plasma. The unique nature of the "manufacturing machinery" in this instance makes the personal nature of the health insurance premiums unavoidable. Insuring against the costs of maintaining petitioner's health[10] is primarily a personal concern, not merely a business concern.[11] Cf. *Sparkman v. Commissioner,* 112 F.2d 774, 777 (9th Cir. 1940). The personal expense of health insurance premiums in the amount substantiated, $93.09, is deductible only by way of section 213(a) as determined by respondent.

Petitioner also claimed business deductions for special high protein foods and "special drugs" or diet supplements. Respondent disallowed the entire deduction for food and all but $112 of the claimed deduction for "special drugs" as being nondeductible personal expenses. While the greater portion of these claimed amounts were those normal expenses necessary for petitioner's personal physical benefit, and thus not deductible under section 262, part of these expenses were incurred by petitioner in her business as a seller of blood plasma. Petitioner went to additional expense, beyond that necessary for her personal needs,[12] to purchase high protein foods and diet supplements for maintaining the quality of her blood plasma. That additional expense is

---

[10]Even premiums on disability policies are not deductible as business expenses unless provided payments specifically cover overhead expenses during the disability period. Otherwise, the payments are available for personal use. *Blaess v. Commissioner,* 28 T.C. 710 (1957). See also *Andrews v. Commissioner,* T.C. Memo. 1970–32.

[11]See also *Vesey v. Commissioner,* T.C. Memo. 1974–163.

[12]Respondent correctly observes that we have rejected the "but for" test as the sole determinant of deductibility under sec. 162. *Drake v. Commissioner,* 52 T.C. 842 (1969); *Kroll v. Commissioner,* 49 T.C. 557 (1968). In keeping with that position, we have sustained respondent's disallowance of that portion of the deduction representing petitioner's food expense generally necessary for her personal comfort. However, that position does not prevent us from finding that the additional expense of a high protein diet is a deductible business expense, when the diet is intimately related to petitioner's production of acceptable blood plasma and petitioner has incurred the additional expense of this special diet solely in furtherance of her business of selling blood plasma. As we stated in *Smith v. Commissioner,* 40 B.T.A. 1038, 1039 (1939), affd. per curiam 113 F.2d 114 (2d Cir. 1940): "The line is not always an easy one to draw nor the test simple to apply. But we think its principle is clear." In the unique situation presented by the instant set of facts, that special foods expense incurred in addition to that necessary for petitioner's personal needs crosses "the line" and becomes a business expense deduction.

deductible under section 162 if properly substantiated. Respondent implies as much by allowing a portion of petitioner's claimed deduction for "special drugs."

It is well settled that the notice of deficiency issued by the Commissioner is presumed correct and that the taxpayer has the burden of proof to show otherwise. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. However, in numerous prior cases, which we will not list here, upon finding the taxpayer to be candid and forthright, we have chosen to follow the rule of approximating a figure for an allowable deduction if reasonable evidence is presented, while bearing heavily upon the taxpayer whose inexactitude is of her own making. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). In the instant case, we find the testimony of petitioner to be reliable and will apply the rule in *Cohan* when appropriate.

Given the evidence and testimony of petitioner detailing her purchases of various vitamin and mineral supplements, we conclude that respondent has already made a reasonable approximation of the deductible expense for "special drugs" in 1976. However, for high protein foods, we feel that some allowance should also be made. Since petitioner's household consisted of petitioner and three teenagers, we conclude that petitioner's share of the 1976 household expense of $2,705 was one-fourth, or approximately $675. Further, since only the additional cost of the special food is deductible, we find in our best judgment that only one-third of petitioner's share of the household food expense, $225, is deductible under section 162.

Next, petitioner claimed a deduction for "travel" in the amount of reimbursement she received from the lab for 95 trips at $5 each, or $475. Petitioner concedes that the $475 was income to her for 1976, but contends that she was transporting her product of blood plasma to the lab for sale and should be allowed to deduct the same amount. Respondent disallowed the entire amount as personal commuting expenses. Once again, the unusual situation presented by the instant set of facts requires a close examination of the distinction between business expenses, which are deductible, and personal expenses, which are not. Commuting expenses are clearly personal expenses and not deductible. *Commissioner v. Flowers*, 326 U.S. 465 (1946); *Feistman v. Commissioner*, 63 T.C. 129 (1974). However, petitioner did not "commute" to the lab. Instead, she made one or

two trips each week to the lab to sell her product of blood plasma. The nature of her product was such that she could not transport it to market without her accompanying it. Of necessity, she had to accompany the blood plasma to the lab. Unique to this situation, petitioner was the container in which her product was transported to market. Had she been able to extract the plasma at home and transport it to the lab without her being present, such shipping expenses would have been deductible as selling expenses. Cf. secs. 1.61–3(a), 1.162–1(a), Income Tax Regs.[13] Therefore, petitioner's trips to and from the lab were solely for business purposes, not for her personal comfort or convenience, and a deduction of $475 will be allowed for those trips made in 1976.[14]

Finally, petitioner claimed a 10-percent depletion deduction for the loss of her blood's mineral content and the loss of her blood's ability to regenerate, which deduction was fully disallowed by respondent. We agree with respondent. Congress enacted sections 611–614 and their predecessors to promote exploration and development of geological mineral resources. See S. Rept. 617, 65th Cong., 3d Sess. (1918), 1939–1 C.B. 117, 120–121. Bodies and skills of taxpayers are not among the "natural deposits" contemplated by Congress in those depletion provisions. *Heisler v. United States*, 463 F.2d 375 (9th Cir. 1972), cert. denied 410 U.S. 927 (1973).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[13]See also respondent's position in Rev. Rul. 67–307, 1967–2 C.B. 253.

[14]In 1976, petitioner made 95 trips to the lab, each a distance of 40 miles, a total of 3,800 miles. Given the reasonable allowance of 15 cents per business mile as set by respondent for 1976, the deduction allowable for petitioner's trips to the lab in 1976 would be $570. See Rev. Proc. 74–23, 1974–2 C.B. 476. However, since petitioner only claimed a deduction in the amount of her reimbursement, $475, and only put this amount in issue, we only allow her a deduction for that claimed amount. See *Rushing v. Commissioner*, a Memorandum Opinion of this Court dated Apr. 21, 1952, affd. 214 F.2d 383 (5th Cir. 1954).